UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| GRAND ISLE SHIPYARDS, INC. | CIVIL ACTION |
| v. | NO. 15-00152 |
| BLACK ELK OFFSHORE OPERATIONS, LLC | SECTION G |
| | JUDGE NANNETTE JOLIVETTE BROWN |
| | MAGISTRATE MICHAEL NORTH |

**DEFENDANT BLACK ELK ENERGY OFFSHORE OPERATIONS, LLC'S ANSWER TO PLAINTIFF'S PETITION FOR ENFORCEMENT OF OIL WELL LIEN ACT LIEN AND PRIVILEGE AND FOR WRIT OF SEQUESTRATION AND COUNTER CLAIM**

**NOW INTO COURT,** through undersigned counsel, comes Defendant, Black Elk Energy Offshore Operations, LLC (hereinafter "Black Elk"), who files this Answer to Plaintiff, Grand Isle Shipyards, Inc.'s (hereinafter "GIS"), Petition for Enforcement of Oil Well Lien Act Lien and Privilege and for Writ of Sequestration (hereinafter "Petition") by averring as follows:

**FIRST DEFENSE**

The Petition fails to state a claim upon which relief can be granted.

**SECOND DEFENSE**

The Petition is barred by prescription, preemption, and/or laches.

## THIRD DEFENSE

**AND NOW**, answering separately the allegations of the Petition, Black Elk avers as follows:

**1.**

The allegations contained in Paragraph 1 of the Petition are denied for a lack of information sufficient to justify a belief as to the truth contained therein.

**2.**

The allegations contained in Paragraph 2 of the Petition are admitted.

**3.**

The allegations contained in Paragraph 3 of the Petition are denied as all of the alleged work was performed off the coast of Louisiana.

**4.**

The allegations contained in Paragraph 4 of the Petition are denied for a lack of information sufficient to justify a belief as to the truth contained therein.

**5.**

The allegations contained in Paragraph 5 of the Petition are denied for a lack of information sufficient to justify a belief as to the truth contained therein.

**6.**

The allegations contained in Paragraph 6 of the Petition are denied for a lack of information sufficient to justify a belief as to the truth contained therein.

**7.**

The allegations contained in Paragraph 7 of the Petition are denied.

5346024_1

**8.**

Black Elk denies the allegations contained in Paragraph 8 of the Petition except to admit that Black Elk owns and operates assets in the following blocks:

    a.  South Pass Block #86 and

    b.  South Pass Block #89.

**9.**

The allegations contained in Paragraph 9 of the Petition are denied for a lack of information sufficient to justify a belief as to the truth contained therein.

**10.**

The allegations contained in Paragraph 10 of the Petition are denied for a lack of information sufficient to justify a belief as to the truth contained therein.

**11.**

The allegations contained in Paragraph 11 of the Petition are denied for a lack of information sufficient to justify a belief as to the truth contained therein.

**12.**

The allegations contained in Paragraph 12 of the Petition are denied.

**13.**

The allegations contained in Paragraph 13 of the Petition are denied.

**14.**

The allegations contained in Paragraph 14 of the Petition require no response of Black Elk.  Should a response be deemed necessary, the allegations are denied.

5346024_1

**15.**

Black Elk denies the allegations in Paragraph 15.

**PRAYER**

Black Elk denies any allegations contained in the prayer of the Petition.

## FOURTH DEFENSE

GIS's claims are barred by its failure to comply with the requirements of the Louisiana's Oil Well Lien Act, La. R.S. 9:4861, *et seq.*

## FIFTH DEFENSE

In the further alternative, Black Elk is entitled to credit and/or offset to any recovery by Plaintiff against it, if any, for any and all damages sustained by Black Elk attributed to the breach of contract, negligence and/or fault of Plaintiff and/or third parties.  Black Elk is also entitled to a credit and/or offset for any payments made to Plaintiff by any other source, collateral or otherwise.

## SIXTH DEFENSE

In the further alternative, Black Elk avers that its liability, if any, which it specifically denies, is purely passive and/or technical while the liability of others is actual and/or active, thus entitling Black Elk to full indemnification from those others who were negligent or otherwise at fault.

## SEVENTH DEFENSE

In the further alternative, Plaintiff's alleged damages, if any, were caused or occasioned by intervening and/or superseding causes for which Black Elk is not legally responsible.

## EIGHTH DEFENSE

In the further alternative, Plaintiff's alleged damages, if any, were the result of unavoidable consequences for which Black Elk cannot be held responsible.

## NINTH DEFENSE

In the further alternative, Plaintiff's alleged incident and damages, if any, were caused or occasioned by fault, negligence, and/or statutory violations of third-parties for which or for whom Black Elk is not legally responsible.

## TENTH DEFENSE

Plaintiff's claims are premature, and Black Elk is entitled to a stay of these proceedings under the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*, as a result of the pending arbitration of Plaintiff's claims.

## ELEVENTH DEFENSE

Black Elk specifically reserves the right to supplement, amend and/or modify its Answer and Affirmative Defenses to conform to such facts as may be revealed during discovery or otherwise.

**WHEREFORE,** Defendant, Black Elk Energy Offshore operations, LLC, prays that its Answer to Plaintiff's Petition for Enforcement of Oil Well Lien Act Lien and Privilege and for Writ of Sequestration be deemed good and sufficient and, after due delays and proceedings be had, there be judgment in Black Elk's favor, dismissing the Petition, with prejudice, and at Plaintiff's cost, and awarding all other relief deemed appropriate by the Court.

5346024_1

## COUNTER CLAIM AGAINST GRAND ISLE SHIPYARDS, INC. BY BLACK ELK ENERGY OFFSHORE OPERATIONS, LLC

**NOW INTO COURT,** through undersigned counsel, comes Defendant, Black Elk Energy Offshore Operations, LLC (hereinafter "Black Elk"), who, files this Counter Claim against Grand Isle Shipyards, Inc. (hereinafter "GIS"), averring upon information and belief as follows:

### THE PARTIES

**1.**

Claimant Black Elk Energy Offshore Operations, LLC ("Black Elk") is a Texas limited liability company with its principal place of business located in Houston, Texas.

**2.**

Respondent Grand Isle Shipyards, Inc. ("GIS") is a Louisiana corporation with its principal place of business in Galliano, Louisiana.

**3.**

At all times pertinent, Black Elk and GIS's relationship was founded on a December 30, 2008 Master Service Agreement.  Black Elk and GIS's adherence to the terms and conditions of the December 30, 2008 Master Service Agreement (Exhibit "A") was reflected in the day to day operations and relationships between Black Elk and GIS. In furtherance of the relationship between Black Elk and GIS, the two parties supplemented the existing Master Service Agreement with a May 5, 2010 Business Alliance Agreement (Exhibit "B") (collectively referred to as the "Agreements").

**4.**

On November 16, 2012, Black Elk was the owner of the West Delta 32 E Platform

(the "Platform"), an oil and gas production platform located in the Gulf of Mexico in Block 32, West Delta Area.

**5.**

A pipeline leading from the Platform was damaged during Hurricane Isaac in August of 2012. While awaiting pipeline repairs, Black Elk used the opportunity to hire contractors to perform maintenance, repair, and upgrade work (the "Work") to the Platform.  Black Elk engaged GIS to perform some of the Work.

**6.**

At all times pertinent, GIS represented and warranted that it was an "expert" in the type of Work to be performed on the Platform and that it was qualified, certified, and authorized to perform said Work.  GIS averred that it was an established and reputable company in the area of industry operations.  GIS also agreed to provide skilled laborers capable of performing the Work in a safe and good and workmanlike manner.  GIS specifically agreed that it would not subcontract any portion of its Work without the prior written consent of Black Elk.  In its Contractor Safety Pre-qualification Criteria Form dated March 1, 2011, GIS affirmatively represented that it would not use subcontractors while performing work for Black Elk.  Black Elk has discovered that this representation was false and fraudulently made.

**7.**

GIS further represented and warranted that it would perform the "work with due diligence, in a good and workmanlike manner, in accordance with all applicable laws and regulations. GIS further represented that it was a vigorous service oriented company in

the oil and gas industry with an extensive expertise set in multiple areas.

**8.**

GIS also represented and agreed to be responsible for initiating, maintaining, and supervising all necessary safety precautions and programs in connection with the work. Moreover, GIS agreed to take all necessary safety precautions for the safety of its employees, subcontractors, agents, and invitees at the work site and to comply and cause its employees, subcontractors, agents and invitees entering on Black Elk property in the performance of the Work, or in connection therewith, to comply with all Black Elk safety rules that may be disclosed or known to GIS.

**9.**

In addition to the workers that GIS needed for the maintenance, repair, and upgrade of the Platform, Black Elk's Platform was manned with contract platform operators provided by Wood Group Production Services, Inc. ("Wood Group").

**10.**

The Platform safety procedures require that any contractor performing "Hot Work" on the Platform obtain a "Hot Work Permit" from Wood Group's representative on site prior to beginning such work.  The Black Elk procedure states: "The designated person-in-charge and the welders shall personally inspect the area in which the work is to be performed for potential fire and explosion hazards.  After it has been determined that it is safe to proceed with the welding or burning operation, the designated person-in-charge shall issue written authorization for the work using a Welding and Burning Authorization Form."

8

**11.**

Hot Work Permits are only valid for twelve (12) hours.  If the work is not completed within twelve (12) hours, the contractor must apply for and receive a new Hot Work Permit prior to completing the work.

**12.**

GIS arrived on the Platform on or about November 8, 2012.  Unbeknownst to Black Elk, GIS did not exclusively bring its own employees on board the Platform.  In fact, the majority of GIS's crew was comprised of employees from a Filipino company named D&R Resources, LLC ("D&R").  To deceitfully hide this fact, GIS had all crew members sign in on the Platform's "Personnel on Board" ("POB") list as employees of GIS.

**13.**

Upon arrival to the Platform, GIS's crew were provided a platform orientation and briefed on the Platform safety procedures, including the process used to apply for and obtain a Hot Work Permit.  In addition to the information received on the platform, GIS was, or should have been, completely familiar with the requirements and expectations for obtaining a Hot Work Permit.  This safety practice is an industry standard and customary procedure for work conducted on offshore platforms throughout the industry.

**14.**

On or about the morning of November 16, 2012, GIS requested and obtained from Wood Group a Hot Work Permit for "welding and cutting on E Platform."  This work was to be performed in the "Wemco Unit, separator, and production header" areas of the

Platform, the same areas of the Platform where GIS's crew had been working the preceding several days.

**15.**

GIS did not request or obtain a Hot Work Permit to work in or around the LACT Unit skid of the Platform on the morning of November 16, 2012.  Nonetheless, GIS's crew began the process of cutting, grinding and welding pipe in or around the LACT Unit of the Platform.  Before beginning work, GIS failed to inspect the lines to make sure that the LACT Unit was isolated from all other piping and systems of the platform.  The proper isolation methods would have included inserting skillets (blind flanges) necessary to ensure isolation of the piping, which the GIS crew failed to perform.  To everyone's detriment and danger, the GIS crew also failed to establish and maintain a proper fire watch, and failed to utilize portable gas monitors to constantly sample the atmosphere conditions during the work, which are also known industry standards.

**16.**

When the GIS crew cut into the pipe, they noticed a liquid draining out.  Rather than stopping work as a reasonable and prudent offshore worker would, and should, have done, the GIS crew ignored this warning and continued to cut the pipe and bevel the edges utilizing a portable electrical grinder.  During this work, a worker reportedly smelled gas, and still the GIS crew failed to immediately stop work.  Thereafter, one of the GIS crew members began to weld a flange onto the sump discharge pipe connected to the Wet Oil Tank which ignited residual hydrocarbons in the line where they were working and caused a massive explosion and fire on the Platform (the "Accident").

**17.**

The Accident caused three workers to be killed, extensive damage to Black Elk's Platform, serious injuries to other personnel, and damage to and loss of equipment. Black Elk's damages are in excess of $11,973,912.84 and continue to grow.  These damages include, but are not limited to:

a.  Fire / explosion cause and origin investigation;

b.  Search and rescue costs and expenses;

c.  Platform equipment and debris removal costs;

d.  Platform structural inspection costs, repair, and expenses;

e.  Repair work design costs and expenses;

f.  Repair work permitting costs;

g.  Platform repairs and platform crane repairs;

h.  Offshore installation costs and expenses;

i.  Crew, equipment, and vessel standby, mobilization, and demobilization costs;

j.  Lost oil burned in the explosion;

k.  Petrochemical clean up and pollution control costs and expenses; and

l.  Attorney's fees and costs associated with the cause and origin investigation, debris removal, clean up, pollution control, structural integrity review, repair permitting, and repair work.

**18.**

Black Elk's investigation into the invoices that are the subject of the instant lawsuit has revealed that GIS is seeking payment on platforms and other projects upon which GIS also used impermissible subcontractors from D&R, and potentially other unknown subcontractors.  Furthermore, Black Elk has learned that GIS previously used

11

D&R subcontractors on numerous other platforms and projects without Black Elk's knowledge.  GIS charged Black Elk its full GIS employee rates for such subcontractors, which Black Elk unknowingly paid.

## CAUSES OF ACTION

### FRAUD

#### 19.

Black Elk incorporates the above numbered paragraphs as if fully set forth herein.

#### 20.

The repair work that GIS was to perform on the Platform required workers who possessed skill, training, experience, safety training, to perform work on offshore oil and gas production platforms.

#### 21.

In its Contractor Safety Pre-qualification Criteria Form, GIS affirmatively represented that it would not use subcontractors while performing work for Black Elk. When GIS and its unauthorized subcontractor D&R arrived on the Platform, GIS hid the fact that D&R employees were present, having them sign in as GIS workers, and misrepresented their training, skills, and experience.  Instead, GIS falsely represented that all of the crew members were GIS employees, possessing the skill, experience, training and safety training that GIS had certified to Black Elk that its employees possessed.

#### 22.

These misrepresentations were material and false, and GIS knew such representations were false at all relevant points in time.  It was not until after the

Accident, during search and rescue operations, that GIS finally informed Black Elk that the workers were not GIS employees, but D&R employees.

**23.**

Black Elk first learned of GIS's use of D&R workers in the aftermath of the West Delta 32 platform explosion in the Gulf of Mexico on November 16, 2012. Black Elk's investigation into GIS's unauthorized subcontracting practices revealed that from December 30, 2008, through the entire duration of the parties' relationship, GIS used an estimated 100-200 unlicensed and unauthorized subcontracted laborers on Black Elk Work, fraudulently and in breach of the Agreements. GIS knowingly concealed the use of subcontracted and inexperienced workers who reportedly were not fluent enough (if at all) in English to communicate with or understand instructions from other personnel on the Platform. GIS concealed this fact because GIS knew that Black Elk would not accept the use of these workers on the offshore Platform, and had represented to Black Elk that it would not use subcontractors. Furthermore, GIS's concealment of subcontracted workers was not limited to the Platform. In fact, GIS had previously used D&R workers on other Black Elk platforms and projects without Black Elk's knowledge or permission.

**24.**

Not only did Black Elk not agree that GIS could use subcontracted laborers, much less unlicensed subcontractors, on any of GIS's Black Elk Work projects, Black Elk also did not agree that GIS could charge Black Elk the same rates for those unauthorized subcontracted laborers that Black Elk agreed to pay GIS for GIS's own employees' work. GIS obtained a secret, windfall profit through this arrangement.

13

**25.**

Black Elk relied upon GIS's false misrepresentations to the injury and detriment of Black Elk, and everyone on the Platform.

**26.**

Black Elk seeks recovery of all damages arising from, caused by, or resulting from GIS's fraud and misrepresentations, whether direct or indirect, including the award of exemplary damages.

**NEGLIGENCE – GROSS NEGLIGENCE**

**27.**

Black Elk incorporates the above numbered paragraphs as if fully set forth herein.

**28.**

GIS possessed a duty to exercise reasonable care in the provision of its crew, and performance of its Work, on the Platform.  Among other breaches, GIS breached the duties it owed by:

a.  Utilizing an unskilled, untrained workforce who did not possess the proper safety training, knowledge, language fluency, or experience to safely conduct the Work on the offshore Platform;

b.  Concealing the use of unskilled, untrained workers upon arrival on the Platform;

c.  Misrepresenting the skill, experience, and safety/hazard training possessed by its crew upon arrival to the Platform;

d.  Failing to obtain a hot work permit for the specific work and specific area where GIS initiated cutting, grinding, welding, and other spark producing / ignition capable activities;

e.  Failing to give notice of the intent to initiate hot work at the LACT unit of the Platform;

14

f.      Failing to inspect the lines of the LACT unit to ensure that they were properly isolated from all other systems and equipment on the Platform;

g.      Failing to install the skillets and/or blind flanges in the piping necessary to isolate the LACT unit from all other systems and equipment on the Platform;

h.      Failing to stop work immediately upon the detection of any unknown, unexpected, or undetermined condition in and around the LACT unit, including but not limited to the presence of fluid in the line being cut and the smell of gas in and around the area where the work was conducted;

i.      Failing to establish a proper fire watch for the work being conducted by the GIS crew at the LACT unit;

j.      Failing to utilize gas monitors to continuously inspect the conditions during the work at the LACT unit; and

k.      And, failing to properly train, monitor, and supervise the GIS crew to ensure safe operations in compliance with all Platform and industry recognized regulations, procedures, and safety requirements.

**29.**

GIS's numerous breaches directly and proximately caused Black Elk injury and damages.

**30.**

Furthermore, these breaches constituted gross negligence.

**BREACH OF CONTRACT**

**31.**

Black Elk incorporates the above numbered paragraphs as if fully set forth herein.

**32.**

GIS had a duty to ensure the competence and qualifications of its crew. Moreover, GIS owed the duty to adequately train, supervise and direct its crew in the performance of their duties on the Platform.

15

**33.**

GIS breached these duties when GIS negligently hired an inexperienced, untrained, non-English fluent, work force to serve as its crew for the Work on the Platform.

**34.**

GIS's breach directly and proximately caused Black Elk injury and damages.

**35.**

Furthermore, this breach constituted gross negligence.

**36.**

GIS warranted to Black Elk that it was an expert in the Work it would perform and that it was qualified, certified and authorized to perform all Work for Black Elk.

**37.**

GIS agreed to be responsible for initiating, maintaining, and supervising all necessary safety precautions and programs in connection with the Work. GIS also agreed to take all necessary precautions for the safety of its employees, subcontractors, agents and invitees at the work site.

**38.**

Moreover, GIS agreed to comply with, and to cause its employees, subcontractors, agents and invitees entering on Black Elk property in the performance of the Work to comply with Black Elk's safety precautions.

**39.**

GIS represented and warranted that its work would be performed with "due

diligence, in a good and workmanlike manner."

**40.**

GIS breached the Agreements with Black Elk by failing to provide qualified personnel to perform the Work in a safe and good and workmanlike manner and by failing to initiate, maintain, and supervise its employees and ensure they adhered to all applicable safety precautions and programs in place.

**41.**

Additionally, GIS breached the Agreements with Black Elk by failing to abide by Black Elk's safety procedures.

**42.**

As a direct and proximate result of GIS's breaches of the Agreements, Black Elk has suffered damages, including reasonable and necessary attorney's fees.

**43.**

GIS used unauthorized D&R subcontracted workers not only on the Platform, but also on numerous other Black Elk platforms and projects.  GIS is seeking payment of invoices on some of the same platforms and projects upon which Black Elk has traced GIS's use of unauthorized subcontracted workers.

**44.**

At no point in time did Black Elk provide written consent for GIS to use any subcontractors for any of GIS's work.  Thus, each and every unauthorized use of D&R, or any other subcontracted worker, was a breach of GIS's Agreements with Black Elk.

17

**45.**

As a direct and proximate result of GIS's breaches, Black Elk has suffered damages, including reasonable and necessary attorney's fees.

## BREACH OF WARRANTY

**46.**

Black Elk incorporates the above numbered paragraphs as if fully set forth herein.

**47.**

GIS represented and warranted to Black Elk that it was an "expert" in the type of Work to be performed on the Platform and that it was qualified, certified, and authorized to perform said Work.

**48.**

Additionally, GIS represented and warranted to Black Elk that it would perform all Work with due diligence, in a good and workmanlike manner, in accordance with all applicable laws and regulations.

**49.**

GIS breached its representations and warranties to Black Elk by failing to complete the Work in a safe, good and workmanlike manner.

**50.**

GIS also breached its representations and warranties to Black Elk by failing to provide fully trained personnel capable of performing the Work requested by Black Elk in a safe manner.

**51.**

GIS further breached its representations and warranties to Black Elk by failing to comply or cause its employees to comply with Black Elk's safety procedures for work on the Platform.

**52.**

As a direct and proximate result of GIS's breaches of the representations and warranties it made to Black Elk, Black Elk has suffered damages including reasonable and necessary attorney's fees.

**53.**

If GIS continues to allege that it is owed amounts for work performed and billed with undisputed invoices, then the amount, if any, that GIS later proves is correct and/or owed should be set off against Black Elk's damages.

Black Elk specifically reserves the right to amend its claimed damages as they become more fully realized and determined.

**SETOFF & RECOUPMENT**

**54.**

The amounts that Black Elk is awarded under its counterclaims should be setoff against any amount that GIS may be awarded on its claims for work done on other projects under the doctrines of setoff and recoupment.

5346024_1

## PRAYER

**WHEREFORE,** Defendant and claimant Black Elk Energy Offshore Operations,

LLC prays that judgment be rendered in its favor and against Grand Isle Shipyard, Inc. at

Grand Isle Shipyard's cost, and an award for:

a)      Actual damages of $11,973,912.84 related to the West Delta 32 Platform;

b)      Damages resulting from GIS's use of unauthorized subcontractors on Black
        Elk's platforms and projects other than the West Delta 32 Platform;

c)      Consequential damages;

d)      Exemplary damages;

e)      Pre- and post-judgment interest at the highest lawful rates as and when
        allowed by law; and

f)      Any other relief deemed appropriate by this Court.

Respectfully submitted:

*/s/ Daniel B. Stanton*

Michael J. O'Brien, T.A. (#27588)
Daniel B. Stanton (#35337)
**KEAN MILLER LLP**
First Bank and Trust Tower
909 Poydras St., Suite 3600
New Orleans, LA 70112
Telephone:  (504) 585-3050
Facsimile:  (504) 585-3051
michael.obrien@keanmiller.com
daniel.stanton@keanmiller.com

**Attorneys for Black Elk Energy Offshore
Operations, LLC**

5346024_1

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this the 3rd day of February, 2015, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to those who are non-CM/ECF participants.

*/s/ Daniel B. Stanton*

**DANIEL B. STANTON**

5346024_1